IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DUGAN, AURORA DUGAN, and MATTHEW TAPSCOTT, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LLOYDS TSB BANK, PLC,<br><br>Defendant. | No. C 12-02549 WHA<br><br>**ORDER GRANTING IN PART MOTION FOR CLASS CERTIFICATION, APPOINTING CLASS REPRESENTATIVES, AND APPOINTING CLASS COUNSEL** |

**INTRODUCTION**

In this proposed class action involving international loan products, plaintiffs move for certification of five classes and subclasses. For the reasons stated below, the motion is **GRANTED IN PART**.

**STATEMENT**

Defendant Lloyds TSB Bank, PLC, is a bank organized under the laws of the United Kingdom with branches in Hong Kong and New York, among other places. Plaintiffs' claims in connection with certain Lloyds' loan products include contractual breaches, breach of the implied covenant of good faith and fair dealing, and violations of consumer protection laws in California, Hawaii, and New York (Cal. Bus. & Prof. Code § 17200, *et seq.*; Haw. Rev. Stat. §§ 480-2 and 481A-3(12); and N.Y. Gen. Bus. Law § 349, *et seq.*,). Plaintiffs also seek declaratory and injunctive relief.

Plaintiffs obtained Lloyds' "dual currency" loans. These loans, which herein Lloyds labels as International Mortgage Service ("IMS") loans: (1) were stated in U.S. dollars but could be redenominated into foreign currency at the borrower's discretion; (2) once redenominated, were allegedly subject to a "principal cap" of 120 percent of the original principal; (3) were subject to a variable interest rate to be set at 1.5 percent above Lloyds' "cost of funds"; and (4) were secured by real property in the United States.

A prior order set out the factual background of the Dugan, Osmena, and Tapscott plaintiffs and permitted intervention of putative class representatives Rika Olson and Jason Ray (Dkt. No. 92). Plaintiffs represented at the time that intervention of the additional plaintiffs would better represent the contours of the proposed classes and the scope of Lloyds' alleged misconduct, though it is now apparent that the primary purpose of their intervention was to expand the potential breadth of the action. With the instant motion, plaintiffs seek certification of five classes and subclasses. The plaintiffs' proposed class definitions are complicated and comprise more than 500 words involving residents of 31 countries.

This order follows full briefing and oral argument, including four requests for supplemental submissions.

**ANALYSIS**

Pursuant to Rule 23(a), for a named plaintiff to obtain class certification, a district court must find: (1) numerosity of the class; (2) there are common questions of law or fact; (3) that the named plaintiffs' claims and defenses are typical; and (4) that the representative parties can fairly and adequately protect the interests of the class.

A class can be certified under Rule 23(b)(3) if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Certification under Rule 23(b)(2) requires a finding that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

2

The Supreme Court has recently restated the evidentiary analysis applicable to class certification under Rule 23:

> [A] party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23. The Rule does not set forth a mere pleading standard. Rather, a party must not only be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b). . . . [I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and . . . certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. The same analytical principles govern Rule 23(b).

*Comcast Corp. v. Behrend*, No. 11-864, ___ U.S. ___, slip op. at 5–6 (Mar. 27, 2013) (quotation marks and citations omitted, emphasis in original).

Plaintiffs' approach to this class certification motion proceeded in two steps. *First*, through prior motion practice, plaintiffs expanded their proposed class definitions, added state law claims from three domestic jurisdictions, and brought in additional plaintiffs who broadened the factual background. *Second*, plaintiffs now propose to certify five broad classes and subclasses, reaching 800–1000 absent class members in 31 countries, with claims subject to the laws of at least eight domestic and international jurisdictions. In short, plaintiffs are seeking certification of all the classes they could imagine, evidently hoping that the Court will filter the confusion into something coherent.

A prior order warned plaintiffs that "[c]ounsel should be careful not to overreach lest their Rule 23 motions eventually collapse of their own weight" (Dkt. No. 92 at 6). This warning was not heeded. Numerous factors counsel against certification of the five classes proposed by plaintiffs. Nevertheless, a certifiable class action can be found within the plaintiffs' proposal, as further explained below.

3

**1.    COMMONALITY.**

There are two major common issues potentially deserving class treatment, although only the first will be certified:

> 1.    In the event that the loan was redenominated from U.S. dollars to a foreign currency, was the principal amount of the loan to be protected against a fluctuation in the exchange ratio such that the principal sum due (in terms of U.S. dollars) would never exceed 120 percent of the original loan amount for purposes of calculating interest?
>
> 2.    After 2008, was the lender stuck with the method it used prior to 2008 to calculate its "Cost of Funds" or was it free to adjust the method so as to impose greater interest rates, both as to loans made before 2008 and after 2008?

If it is eventually determined herein that the lender's practice in implementing these clauses was in error (and that is by no means a foregone conclusion), then the extent to which any given borrower was overcharged would be a uniquely individual inquiry.  Nonetheless, that inquiry could be done, file by file if necessary, possibly via separate if burdensome trial(s), at least for the first issue.

Counsel tries to lard into class treatment far too many exotic legal theories and configurations.  Although the classes worthy of certification all share the same contract language and the same governing law provision, counsel would toss in multitudinous state law theories that could only apply to a small subset of borrowers.  Counsel also propose to toss in dissimilar clauses subject to the laws of Singapore and other jurisdictions.  This would overcomplicate the case to the breaking point and will not be allowed.  Uncertified issues and claims may be pursued on an individual basis and may *not* be included in any class settlement.

**2.    THE PROBLEM OF TYPICALITY AND ADEQUATE REPRESENTATION.**

**A.    The Role of Kilroy.**

Usually, typicality and adequacy are not problems in class actions, but this case is an exception.  Michael Kilroy is not a party to this action.  Nevertheless, he appears to have played a key role in shaping this litigation.  His influence renders three of the putative class plaintiffs

4

atypical. Kilroy, a resident of southern California, took out six IMS loans from Lloyds using properties located in California to secure the loans. Lloyds subsequently sued Kilroy in three California state court actions (two of which have since been consolidated), alleging that the loans are in default. Kilroy has asserted cross-claims in each action that parallel the plaintiffs' claims in this action, namely that Lloyds violated the 120% and Cost of Funds clauses in the loan agreements. According to plaintiffs, Kilroy has estimated his damages in the three actions to be approximately $170,000. The aggregate principal of his six loans at issue totals more than $23 million (Dkt. No. 188 at 5–6; Dkt. No. 173 at 5–6).

Up until this motion, Kilroy was represented in these state court actions by Steptoe and Johnson, LLP — the same firm that represents all of the putative class plaintiffs except the Osmenas. Steptoe has also represented Kilroy in several other lawsuits (Dkt. No. 133 ¶¶ 1–7).[1] After the Kilroy litigation was underway, Steptoe commenced this putative class action as a second front. Kilroy participated in at least one meeting with plaintiffs herein and both of their law firms regarding the subject of the litigation.

Kilroy has particularly significant connections to plaintiffs Tapscott and the Osmenas. Tapscott and Kilroy have been friends for at least 15 years. The two communicate regularly and have continued to do so during the course of this litigation. Kilroy first informed Tapscott of the IMS loans in 2006, and was Tapscott's sole source of information about the IMS loans before applying for one. Tapscott learned of both Magellan Japan (a broker for the IMS loans) and Steptoe through his communications through Kilroy. And, Kilroy is one of Tapscott's real estate clients (Dkt. No. 144-7 at 21–22, 61–63, 71–72, 95–97, 107–108, 195–196).

Kilroy is also a friend of the Osmenas and has known David Osmena for 20 years. Kilroy was likewise the sole source of information about the IMS loans for the Osmenas before they applied. Apparently through connections with a IMS loan broker and/or Lloyds itself, Kilroy even received a one percent fee for the Osmenas' loan transaction. Kilroy is also (in a sense) a client of the Osmena's: since 2006, the Osmenas have loaned Kilroy $705,000,

---

[1] Defendant's request that the Court take judicial notice of the existence of the Kilroy suits is **GRANTED**.

5

approximately $400,000 of which remains to be repaid (Dkt. No. 144-4 at 55, 120–24, 132–35, 139–41).

Kilroy's business dealings with Tapscott and the Osmenas are problematic for this litigation. They create a risk that these putative class plaintiffs will be motivated to take positions that favor Kilroy to the detriment of other absent class members. On this basis, this order concludes that Tapscott and the Osmenas are atypical and unsuitable class representatives.

Although Kilroy's relationship with Steptoe might otherwise disqualify that firm as class counsel, Steptoe recently has withdrawn from representing Kilroy as counsel in the three state court actions. Thus, Kilroy's ongoing client relationship with Steptoe has been completely severed. In addition, Steptoe's engagement letter with Kilroy included conflict waiver provisions, and there are no protective orders in the state court actions that threaten to interfere with discovery in this action. This order holds that these facts are sufficient to limit the risk that Steptoe's loyalties will be divided.[2]

### B. Breaches of the Loan Agreements.

There is yet a further typicality problem. Defendant contends that the putative class plaintiffs lack typicality because *all* of them breached their loan agreements with defendant in one or more ways. Except as to the Dugans, this order agrees. The IMS loan agreements specified they were available only for purchasing or refinancing *investment* property — as opposed to *home* mortgages. Defendant alleges that all of the plaintiffs (except the Dugans) breached this aspect of their loan agreements. The allegations are supported by the language of the plaintiffs' loan agreements and admissions in the plaintiffs' deposition transcripts, including an admission by one plaintiff that defendant represented the loan would not be undertaken if she lived in the property.

In addition, the majority of the plaintiffs (including the Dugans) breached loan provisions regarding maintaining required loan-to-value ratios. Furthermore, the Dugans transferred the

---

[2] There are no conflict waiver provisions as between Steptoe and the Osmenas because the latter are represented by Foley Bezek Behle & Curtis, LLP in this action.

6

1  collateral for one of their loans without defendant's consent. These allegations are likewise
2  supported by deposition testimony.

3  Plaintiffs do not dispute that these breaches occurred. Rather, plaintiffs argue that their
4  breaches are immaterial. Their reply, however, addresses only the loan-to-value breaches;
5  it is nearly silent on the significance of the other breaches identified by defendant. Importantly,
6  plaintiffs' reply does not cite any authority addressing the significance of such breaches in an
7  analogous factual context.

8  "A named plaintiff's motion for class certification should not be granted if there is a
9  danger that absent class members will suffer if their representative is preoccupied with defenses
10 unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation marks
11 omitted). Although defendant has pled affirmative defenses of estoppel, unclean hands, and
12 *in pari delicto*, there is no indication the breaches described would justify Lloyds improperly
13 increasing plaintiffs' interest rates, or otherwise violating the loan agreements. There is,
14 however, a different problem. Except for the Dugans, plaintiffs' apparent falsification and/or
15 misrepresentation of their residency could come out during cross-examination at trial. This
16 could harm their credibility in the eyes of the jury, creating a risk that absent class members'
17 chances of success will suffer due to plaintiffs' peculiar circumstances.

18 On the current record, the Dugans' alleged breaches do not carry the same risk. This
19 order holds that, except for the Dugans, plaintiffs' alleged contractual breaches render them
20 atypical of the class and inadequate class representatives.

21 This leaves the Dugans as the only suitable class representatives. Aside from the issues
22 raised above, the evidence shows they are typical of the proposed classes and this order finds
23 that they satisfy the typicality requirement of Rule 23. The Dugans are California residents. "In
24 or around March 2007, . . . [they] took out a total of approximately $4,547,000 in [three] loans
25 from [Lloyds] secured by three real properties located in Hermosa Beach and Manhattan Beach,
26 California" (First. Am. Compl. ¶6). Their loan agreements contain 120% clauses and are subject
27 to Hong Kong law (Dkt. No. 98-1 at 1–2).

28 **3.    THE CERTIFIED CLASSES.**

7

1    Plaintiffs' five proposed classes are unmanageable and collapse under their own weight.
2 Although the majority are subject to Hong Kong law, 115 of the 888 loans in the putative class
3 are governed by the law of the United Kingdom, Singapore, or Malaysia.³ Plaintiffs contend that
4 "the laws of the U.K., Malaysia, and Singapore do not vary materially from the law of Hong
5 Kong," but this contention is unsubstantiated. It would be too unwieldily to wedge the
6 complications of other foreign jurisdictions into this action. Plaintiffs' bid to certify classes
7 based on New York and Hawaii law is rejected for the same reason. Moreover, because all of
8 the plaintiffs except the Dugans are atypical, absent class members from these jurisdictions
9 would lack a class representative.

   Plaintiffs' overreaching notwithstanding, the motion can be pared down to two
certification-worthy classes. This order **CERTIFIES** the following nationwide Rule 23(b)(2) and
23(b)(3) class under Hong Kong Law:

> All IMS borrowers obligated to Lloyds TSB Bank, PLC at any
> time since May 17, 2006, whose loan documents expressly were
> governed under the law of Hong Kong and included a 120%
> Clause and who currently reside in the United States and for whom
> a first-class mailing address is known, but excluding all borrowers
> whose loan documents include a forum-selection clause other than
> the United States. This class is for both declaratory relief and
> damages.

For purposes of this order, 120% Clause means a clause stating as follows:

> Notwithstanding the foregoing, in the event the loan is
> redenominated, any fluctuations in the value of the currency from
> time to time shall not result in a principal sum which exceeds
> [*120% of the original facility amount*].

   This order also certifies the following injunction/restitution class under California unfair
competition law (Cal. Bus. & Prof. Code § 17200, *et seq.*):

> All IMS borrowers obligated to Lloyds TSB Bank, PLC at any
> time since May 17, 2006, whose loan documents expressly were
> governed under the law of Hong Kong and included a 120%
> Clause and who currently reside in California now and for whom a
> first-class mailing address is known, but excluding all borrowers
> whose loan documents include a forum-selection clause other than
> California.

---

³ Plaintiffs contend there are "roughly 1000" putative class members (Reply 7 n.7). This difference is immaterial for the purposes of this analysis.

8

Please note that both classes focus on the 120% Clause, the damages/declaratory relief class being nationwide and the Section 17200 injunction/restitution class being limited to California.

These classes shall include all borrowers with the clause regardless of whether the loan was initially drawn down in yen rather than dollars. If that distinction makes a difference on the merits, it will be taken into account in the ruling on the merits.

This order finds that common questions will predominate for these classes. These classes have a common method of proof because all absent class members are subject to the same contractual language, subject to the same governing law, and there is no difference between those who borrowed before 2008 versus after 2008. Thus, definitive interpretation of these contracts — and whether defendant's conduct violates their provisions — will resolve the claims of all class members in a single stroke. As explained above, the individualized inquiry necessary to determine class members' particular damages will not defeat the commonality of the underlying issue. And, all of the class members have an interest in having their legal rights determined in order to govern their loan agreements.

Lloyds counters that any adverse judgment would be disregarded by it insofar as it would be unenforceable abroad and thus would be an idle act and a meaningless waste of resources. If Lloyds loses this case, it may well be that foreign courts will ignore our judgment, though that has not been established yet. Nonetheless, if Lloyds loses this case, it certainly could be facing an injunction under Section 17200 and stopped cold from doing any further illegal business in California. No foreign entity should be allowed to engage in unfair business practices in California and escape a California cease-and-desist order on the theory that foreign courts might not recognize the order. Even if the order merely closes the door on Lloyds in California, that alone would be significant class relief. Of course, no determination has yet been made that Lloyds has done anything wrong in California or elsewhere.

Plaintiffs request that the proposed definition for the 120% Clause be modified to include contract language that is substantially similar. Otherwise, they contend, absent class members may be excluded on the basis of immaterial differences in their loan agreements. This argument

9

has some merit, but it is difficult to apply on a classwide basis. The parties shall meet and confer in order to identify language that they agree equivalent in all material respects. If the parties fail to reach an agreement, absent class members with non-conforming language shall be excluded. Both sides are requested to participate in this meet-and-confer process in good faith.

At oral argument, the parties were uncertain as to the number of absent class members that would appear in a particularly-formulated class or subclass. There was no dispute, however, that the number of qualifying, absent class members would exceed 80 individuals. This is more than sufficient for numerosity under Rule 23 and this order finds that the numerosity requirement is satisfied. The parties also agreed that the five million dollar jurisdictional minimum was met for the purposes of the Class Action Fairness Act.

Based on *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985), this order is persuaded that the damages class may be expanded nationwide so long as reliable mailing addresses are known and first-class mailed notice is used. The damages/declaratory relief class will not be limited to California residents. Nonetheless, only the Hong Kong contract claim will be certified (including any Hong Kong contract covenant of good faith and fair dealing claim). All other state law claims will be reserved to the class members.

### 4. THE COST OF FUNDS CLAIM.

Plaintiffs also seek certification of various classes based on the Cost of Funds provision in the plaintiffs' loan agreements. Following oral argument, an order requested additional briefing on this specific topic (Dkt. No. 194). After due consideration, plaintiffs' request to certify a Cost of Funds class is **DENIED**.

The difficulty with certifying a Cost of Funds class stems from two facts. *First*, the Cost of Funds provisions expressly provide Lloyds with discretion to change its method of calculation, but do not specify the method of calculation. For example, a Cost of Funds provision in the Dugans' loan agreements stated:

> "Cost of Funds" is defined as the cost (calculated to include the costs of complying with liquidity and reserve assets requirements) in respect of any currency expressed as a percentage rate of funding for maintaining the loan or loans in that currency *as conclusively nominated by Lender from time to time*.

10

(Dkt. No. 98-1 at 1)(emphasis added).

*Second*, plaintiffs have not identified a viable common method of proof. Put differently their proposed method of common proof would do a disservice to a large part of the proposed class by limiting the proof to a single theory that abandons viable theories available only to those who borrowed before the change in calculation methods in 2008.

For loans originating prior to 2008, it is entirely plausible that many class members might have relied on a long-established practice as to the cost of funds and that this defined the reasonable expectations of the parties.[4] In the Court's experience, many of those who borrowed before 2008 would have a legitimate argument that (1) they knew of and had relied on the low interest rate and low cost-of-funds determination previously used by Lloyds, and (2) that their reasonable expectations were upended when Lloyds abruptly changed the method at the onset of the financial crisis in 2008 and jacked up the rates. This argument is available only to pre-2008 borrowers, for borrowers in say 2009 would have known from the outset that the old method and lower rates were history. This argument available to pre-2008 borrowers would be lost and abandoned under plaintiffs' approach in hopes of finding a theory common to both pre-2008 and post-2008 borrowers. The loss is not worth the benefit, in the Court's view, and would be unfair to the pre-2008 borrowers.

It is no answer to say that the clause read the same before and after 2008 and therefore it had to lead to the same bank method of calculation before and after for all borrowers. A 2008 borrower who was told up front that he or she would have to pay the then going rate should not receive a windfall reduction after the fact merely because a 2006 borrower might be entitled to keep the lower rate he or she was told when the earlier loan was made. Yes, the clause read the same at all times, but it expressly stated at all times that the rate might change from time to time. For purposes of this clause, the borrowers before 2008 are in a materially different position from the borrowers after 2008 and plaintiffs' attempt to invent an overarching common theory of recovery would do a disservice to one group. As the Kilroy litigation shows, it is entirely

---

[4] Even as to those, the evidence in the record shows that the putative plaintiffs had varying understandings of how the Cost of Funds was calculated (Dkt. No. 204 at 2).

11

1  possible that other IMS borrowers will be sued by Lloyds for default and/or otherwise embroiled
2  in repeats of the Kilroy litigation and those borrowers should have at their disposal *all* of the
3  claims and defenses available to their individual cases.

4      **5.**    **RULE 23(a)(4): ADEQUACY OF CLASS REPRESENTATIVES AND COUNSEL.**

5  Rule 23(a)(4) requires that the representative plaintiff and class counsel fairly and
6  adequately represent the interests of the class. The contract language in the certified class
7  definitions mirrors the language of the Dugans' loan agreements. On the current record, their
8  adequacy as class representatives has been established and this order **APPOINTS** John Dugan
9  and Aurora Dugan as class representatives for both classes.

10  The Dugans are represented in this action by attorneys from the Steptoe firm.
11  As explained above, Steptoe's potential conflict of interest has been alleviated by the withdrawal
12  of that firm from the representation of Kilroy. Pursuant to Rule 23(g), Attorneys William
13  Swank, Larry Janssen, Stephen Fennell, Libretta Stennes, and Lawrence Riff of the Steptoe
14  firm are **APPOINTED** as class counsel for both classes.

**CONCLUSION**

16  For the reasons stated, plaintiffs' motion for class certification is **GRANTED IN PART**.
17  The Dugans must execute an acknowledgment of their fiduciary duty to the classes
18  defined above, of the fact that they will be the only class representatives, and of the selection of
19  Steptoe (and only Steptoe) as their counsel. This must be filed by **MAY 2**.

20  Counsel shall have until **MAY 2** to identify and agree on which language in the absent
21  class members' loan agreements is substantially similar for the purposes of the 120% Clause.
22  If counsel fail to reach agreement, the class members with non-conforming language will be
23  excluded from the classes. Any party that contends a clause is substantially different from the
24  clause here at issue shall be hereafter estopped from arguing that any ruling herein favorable to
25  that party should be extended to said clause. Counsel shall file a list of all 120 percent clauses
26  and shall indicate which are jointly deemed substantially similar and which are not (and the
27  name of the party contending they are not).

Also by **MAY 2**, counsel shall submit an agreed-on form of class notice, plan of dissemination, and time table and shall submit a list (under seal) of all names and mailing addresses of all class members. This list shall comprise the class to be bound by the judgment.

No claim excluded from class treatment may be included in any settlement.

**IT IS SO ORDERED.**

Dated: April 19, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE