IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN DUGAN, *et al.*,

    Plaintiffs,

v.

LLOYDS TSB BANK, PLC,

    Defendant.

 /

DAVID OSMENA, *et al.*,

    Plaintiffs,

v.

LLOYDS TSB BANK, PLC,

    Defendant.

 /

No. C 12-02549 WHA

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this action involving international loans, two plaintiff borrowers and defendant bank move for summary judgment on the claims *not* certified for class treatment. All motions are **DENIED,** except for the bank's motion directed at the claim under California's unfair competition law which is **GRANTED**.

## STATEMENT

The background of this action has been set forth in prior orders (Dkt. Nos. 92, 203). In brief, plaintiffs John Dugan, Aurora Dugan, Matthew Tapscott, Rika Olson, and Jason Ray obtained defendant Lloyds TSB Bank, PLC,'s "dual currency" loans. Lloyds is an international

bank organized under the laws of the United Kingdom with branches in Hong Kong and New York, among other places.  These loans, which Lloyds labeled as International Mortgage Services ("IMS") loans:  (1) were stated in U.S. dollars but could be redenominated into foreign currency at the borrower's discretion; (2) once redenominated, were allegedly subject to a "principal cap" of 120% of the original principal; (3) were subject to a variable interest rate to be set at 1.5% above Lloyds' "cost of funds"; and (4) were secured by real property in the United States.

The operative complaint alleges that Lloyds breached the loan agreement in two ways:  (1) after plaintiffs redenominated their loans, Lloyds then recalculated their principal owing at an amount higher than the 120% cap provided by the loan agreement; and (2) Lloyds "arbitrarily" raised the interest rate contractually tied to Lloyds' "cost of funds," even though other cost-of-funds indices worldwide were falling.  Plaintiffs' claims in connection with Lloyds' loan products include contractual breaches, breach of the implied covenant of good faith and fair dealing, and violation of consumer protection laws in California, Hawaii, and New York (Cal. Bus. & Prof. Code § 17200, *et seq.*; Haw. Rev. Stat. §§ 480-2 and 481A-3(12); and N.Y. Gen. Bus. Law § 349, *et seq.*).  Plaintiffs also seek declaratory and injunctive relief.

An order dated April 19, 2013, granted in part plaintiffs' motion for class certification, appointed John Dugan and Aurora Dugan as class representatives, and appointed attorneys from the Steptoe firm as class counsel.  The order certified two "120% clause" classes and denied certification to various "cost of funds" classes (Dkt. No. 203 at 7–12).  This order only concerns the non-certified claims.

On December 12, 2013, plaintiffs John Dugan and Aurora Dugan moved for partial summary judgment on Lloyds' liability for (1) breach of contract in relation to the 120% clause and (2) breach of contract in relation to the "cost of funds" provision (Dkt. No. 342).  On the same day, Lloyds moved for summary judgment on all claims (Dkt. Nos. 348, 357).

This order follows settlement of the class claims.  Remaining are individual, non-class claims, now up for summary judgment.  The motions for summary judgment were fully briefed and a hearing was held.

**ANALYSIS**

**1.   "COST OF FUNDS."**

The primary question to be resolved is whether Lloyds was within its rights to change the formula for calculating the interest rates charged to IMS borrowers. Lloyds asserts that the "cost of funds" provision of the facility agreement expressly provided Lloyds with discretion to change its method of calculation, specifically allowing it to add a Liquidity Transfer Pricing charge ("LTP charge") to the interest rate (Lloyds Br. 14). Plaintiffs assert, on the other hand, that the "cost of funds" provision was ambiguous, and that in light of custom and practice, Lloyds lacked discretion to change its formula (Dugan Br. 18).

The interest rate on plaintiffs' loans was to be based upon "cost of funds," as the term is defined in the facility agreement:

> (a) Interest on amounts outstanding under the Facility will be calculated at 1.5% per annum *above the Lender's Cost of Funds* (as herein defined) with the interest period fixed for successive three months periods. Interest will be payable quarterly in arrears and on the last day of each interest period applicable to the currency of the Advance. The *Lender's Cost of Funds means* the cost (calculated to include the costs of complying with liquidity and reserve assets requirements) in respect of any currency expressed as a percentage rate of funding for maintaining the Advance or Advances in that currency *as conclusively nominated by the Lender from time to time.*

(Khula Decl., Exh. 1 at 5) (emphasis added).

In order to resolve the parties' respective summary judgment motions, (1) the foreign law upon which the motions are based must be clear, and (2) there cannot be a "genuine dispute as to any material fact." FRCP 56(a). For the following reasons, this order holds that, as to the breach-of-contract claim, the dueling summary judgment motions are **DENIED**.

**A.   Choice-of-Law.**

The respective facility agreements in plaintiffs' loan documents contained Hong Kong choice-of-law provisions (First Amd. Compl. ¶¶ 39–40). Neither side disputes this (Dugan Opp. 19).

Federal Rule of Civil Procedure 44.1 states:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

While the parties gave notice of their intent to rely of Hong Kong law, neither the expert analysis nor the case law provided is sufficient to make a summary determination (Dkt. Nos. 344, 349-18, 350, 371, 378, 389, 392).

Lloyds, for example, submitted the declaration of Anselmo Reyes, a professor of legal practice at the University of Hong Kong. Reyes' analysis, however, focuses entirely on the now-settled 120% clause claims. With no direct analysis of Lloyds "cost of funds" arguments, the Reyes' declaration does not provide enough support for the Court to find for Lloyds as a matter of law (Reyes Decl. 349-18).

At the April 24 hearing, Lloyds' counsel argued that paragraphs 15 through 18 of the Reyes declaration cover the issues of law relevant to this motion. That portion of the declaration, however, merely states that under Hong Kong law, "[c]ourts will construe a contractual provision in light of the parties' agreement as a whole" and that "words" will be given their "natural and ordinary meaning" rather than being construed by a party's "uncommunicated subject belief" (*id*. at ¶¶ 15–18). Broad legal generalizations of this nature are insufficient for summary determination in this instance.

Plaintiffs, for their part, submitted two declarations of John Brewer, a practicing barrister in Hong Kong (Dkt. No. 168). The first declaration, in connection to their motion for partial summary judgment, contains no analysis of any claim currently in dispute. It merely "stat[es] (a) the elements required to bring a cause of action under Hong Kong law for beach of contract, also (b) the nature and extent of damages recoverable thereunder . . ." (*ibid*.).

Similarly, Brewer's second declaration, associated with plaintiffs' opposition to Lloyds' motion for summary judgment, also lacks analysis related to the breach-of-contract claim (Dkt.

4

Not. 368). Brewer explicitly states that he does not "express a view" on the rival contentions whether the contract granted Lloyds "an unfettered right to determine the cost of funds provision" (*id*. at 24). Instead, Brewer focuses his analysis on the good faith and fair dealing claim, arguing that if Lloyds did have discretion to change the formula for calculating interest rates, Hong Kong law "nevertheless imposes on such unfettered right a duty to exercise discretion[,] honesty and in good faith" (*ibid*). Brewer's analysis skips over the main question — whether Lloyds had discretion, under the contract, to change the formula for calculating the interest rates charged to IMS borrowers — and focuses instead on the secondary issue of whether Lloyds acted in good faith in making those rate changes. Accordingly, his expert analysis is not sufficient to grant summary judgment to Dugan plaintiffs on the breach-of-contract claim.

Although Rule 44.1 states that a determination of foreign law is "treated as a ruling on a question of law," the rule particularly calls out "testimony" as a source the judge may consult. The Court will benefit from hearing the testimony of the experts at trial (assuming they comply with Rule 26).

### B.     Further Factual Disputes.

Material factual disputes remain that make summary adjudication inappropriate. Lloyds argues that the "cost of funds" breach-of-contract claim is ripe for summary judgment because its terms are unambiguous. It cites the last clause of the "cost of funds" provision — "as conclusively nominated by the Lender from time to time" — as giving Lloyds the right to determine the cost of funds charge related to the loans at issue (Khula Decl. ¶ 83). According to Lloyds, this right was exercised in August 2009, March 2011, and May 2012, when it changed the "cost of funds" interest rate "in response to an increase in its costs of funding the IMS loans" (*id*. at 84). "There can be no express breach of the Loan Agreement where [Lloyds] did exactly what the plain language of the contract permits it to do" (Lloyds Br. 14).

The "cost of funds" provision, however, is not as clear as Lloyds contends. Dugan plaintiffs make several arguments for why Lloyds lacked discretion to raise interest rates. *First*, plaintiffs argue that the "conclusively nominated" language in the agreement modifies "currency," and not "costs" (Dugan Br. 2). According to plaintiffs, Lloyds retained the right to

5

switch *the currency* of the loan to the country in which the collateral real property is located, but not the right to raise interest rates above the industry definition of "cost of funds." *Second*, Dugan plaintiffs argue that "custom and practice" demonstrate that Lloyds lacked discretion to change the way it calculated interest rates. "[F]or over 20 years the term 'Cost of Funds' . . . was expressly tied to 3-month LIBOR [London Interbank Offered Rate]" (Dugan Br. 18, Hector Exh. 3, 7, 8). *Third*, plaintiffs' expert Michael John Petley, argues that the term "cost of funds" has only one meaning in the industry, which is "exactly as it purports to be, namely the ascertainable benchmark or base cost for the lender when borrowing in a particular currency (or currencies) for a specific and known time duration, consistent with the stated funding duration of 90-days" (Petley Decl. ¶ 6). Plaintiffs argue that when Lloyds included the LTP charge in the interest rate, it not only violated the contract but also conflicted with industry custom.

It becomes clear when weighing the parties' arguments that issues of material fact remain as to whether the contact term was ambiguous.

The Restatement (Second) of Contracts states:

> A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.

Restatement (Second) of Contracts Section 212 (1981).

Here, the evidence at this stage admits of multiple conflicting, reasonable inferences. Thus, this order holds that material issues of fact remain concerning the interpretation of the "cost of funds" provision. In accordance with the laws of Hong Kong, extrinsic evidence — custom and usage, course of dealing, admissions made by one side or the other — must be brought to bare for resolution of the dispute. Accordingly, the dueling motions for summary judgment as to the "cost of funds" breach-of-contract claim are **DENIED**.

### 2. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Next, Lloyds moves for summary judgment of plaintiffs' implied covenant claims. Lloyds argues that Hong Kong courts generally do not read in any implied terms or duties into a contract between banks and their customers. Because plaintiffs provided Lloyds "with the express right to

6

'conclusively nominate[]' the Cost of Funds charge 'from time to time,'" Lloyds says it could not have "violated an implied covenant of good faith and dealing for acting pursuant to its contractual rights" (Lloyds Br. 19).

As discussed above, more than one rational inference can be drawn from the "cost of funds" provision. Accordingly, Lloyds' summary judgment motion on the implied covenant of good faith and fair dealing claim must be **DENIED**.

### 3. CALIFORNIA UNFAIR COMPETITION LAW.

Lloyds argues that Dugan plaintiffs' UCL claim is barred by the choice-of-law provision in the facility agreement. The facility agreement states that, "the laws of Hong Kong shall govern this transaction" (Dugan Facility Agreement, Khula Exh. 1 at 3). Lloyds argues that because the UCL is a creature of California statute, and has no comparable provision under Hong Kong law, it must be dismissed as a matter of law (Lloyds Br. 22).

Plaintiffs respond with three arguments. *First*, plaintiffs argue that applying Hong Kong law to bar the UCL claim would violate a fundamental public policy interest of California to protect resident consumers. Plaintiffs argue that California has a materially greater interest than Hong Kong in protecting its residents where the transaction at issue involves real property located within the State. *Second*, plaintiffs argue that the parties did not intend for Hong Kong law to *exclusively* govern the agreement. *Third*, Lloyds' position that the UCL claim is barred conflicts with the class certification order (Dugan Opp. 19).

#### A. Enforcement Would Not Contravene a Fundamental California Public Policy.

The proper approach for determining the enforceability of a contractual choice-of-law provision, as stated by the California Supreme Court, is as follows:

> [T]he court [must] first determine either:
> (1) whether the chosen state has a substantial relationship to the parties or their transaction, or
> (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties'

7

> choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a "materially greater interest than the chosen state in the determination of the particular issue. . . ." If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstances we will decline to enforce a law contrary to this state's fundamental policy.

*Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 466 (1992).

The first prong of the *Nedlloyd* test asks whether there is any reasonable basis for the parties contractual choice-of-law provision. Here, Lloyds underwrote, and serviced the IMS loans out of its Hong Kong branch for clients in many countries (Lloyds Reply Br. 12). *Nedlloyd* held that "the presence of two Hong Kong corporations as parties also provide[d] a 'reasonable basis' for a contractual provision requiring application of Hong Kong law. *If one of the parties resides in the chosen state, the parties have a reasonable basis for their choice*." *Id*. at 467 (internal citation omitted) (emphasis added). Because Lloyds is based in Hong Kong, a reasonable basis exists for applying Hong Kong law to the contract.

The second *Nedlloyd* step is a showstopper for plaintiffs' UCL claim, namely whether Hong Kong law is contrary to a *fundamental* policy of California. This order agrees with other decisions in this district which have upheld choice-of-law provisions even when doing so restricts UCL claims. *Kilgore v. Keybank, N.A.*, 2009 WL 1975271, at *15–17 (N.D. Cal. July 8, 2009) (Judge Thelton Henderson) (holding that there is "no fundamental policy in favor of UCL suits against banks"), *rev'd on other grounds*, 718 F.3d 1052 (9th Cir. 2012); *accord Madanat v. First Data Corp.*, 2011 WL 208062, at *12 (N.D. Cal. Jan. 21, 2011) (Judge Susan Illston). As in *Kilgore* and *Madanat*, plaintiffs have not shown that forcing them to proceed under Hong Kong law without a UCL claim would contravene strong public policy considerations in California. Plaintiffs merely state that they wish to hold Lloyds subject to the "sharper teeth" embodied in California's consumer protection regime (Dugan Opp. 29). This is not enough.

The decisions cited by plaintiffs in which UCL claims were allowed to proceed, despite a choice-of-law provision, are distinguishable in that they all involved relatively unsophisticated consumers, towards whom the fundamental policy concerns of California may be more solicitous.

8

*Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1041 (N.D. Cal. 2010) (consumers vs. internet service provider); *Brazil v. Dell, Inc*., 2010 WL 8816312 (N.D. Cal. Mar. 29, 2010) (desktop computer purchasers).  Plaintiffs, on the other hand, are sophisticated real estate investors more analogous to the borrowers in *Kilgore*, the merchants in *Madanat*, or the commercial actors in *Nedlloyd.*  These are plaintiffs, admittedly in California, who engaged in a financial play on the international currency markets and agreed to apply Hong Kong law in doing so.  California has no bedrock need to protect such speculators.

### B. The Parties Contemplated Using California Law.

Plaintiffs also argue that while the facility agreement and promissory note may have contained a Hong Kong choice-of-law provisions, the security instrument had a California choice-of-law provision (Khula Decl. 2 at 25).  Plaintiffs argue that all the documents must be construed together as a whole.

The facility agreement and the promissory note, however, are the only documents in which the "cost of funds" definition appears, and both explicitly state that "the laws of Hong Kong shall govern this transaction" (Khula Exhs. 1, 2).

### C. The Class Certification Order.

Next, plaintiffs argue that to dismiss the UCL claim would be in contravention of the class certification order which certified "one class under Hong Kong law and another under California's UCL, limited to California residents" (Dugan Opp. 23).

The April 19, 2013, order certified a UCL class as "[a]ll IMS borrowers obligated to Lloyds TSB Bank, PLC[,] at any time since May 17, 2006, *whose loan documents expressly were governed under the law of Hong Kong* . . . who currently reside in California . . ." (Dkt. No. 203) (emphasis added).  Nowhere did the order state that the California UCL class would be governed by California law.  Accordingly, Lloyds' motion to dismiss Dugan plaintiffs' UCL claim is **GRANTED**.

Although Lloyds' motion is couched as a motion for summary judgment of all claims, it only explicitly mentions the California UCL claims (Lloyds Br. 22).  Individual plaintiffs' UCL claims under the laws of Hawaii and New York are therefore not implicated in the bank's motion,

even though Dugan plaintiffs mention them in opposition. This order makes no judgment as to the Hawaii or New York UCL claims.

Furthermore, while the parties' settlement of all class claims resolved UCL claims in relation to the 120% clause, it did not resolve the individual "cost of funds" UCL claims. Accordingly, Lloyds' motion for summary judgment *only* implicates the California "cost of funds" UCL claims, and not the 120% clause UCL claims that have been settled.

## CONCLUSION

All motions are **DENIED,** except for the bank's motion to dismiss the California UCL claim which is **GRANTED**.

The trial will commence **MONDAY, JULY 7 AT 7:30 A.M.** in Courtroom 8, 19th Floor, San Francisco. The final pre-trial conference is set for **TUESDAY, JUNE 24 AT 9 A.M.**

**IT IS SO ORDERED.**

Dated: April 24, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE